# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-60001

UNITED STATES OF AMERICA,

    Plaintiff - Appellee

v.

KENNETH E. FAIRLEY,

    Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

January 22, 2018

Lyle W. Cayce
Clerk

Appeal from the United States District Court for the
Southern District of Mississippi

Before WIENER, HIGGINSON, and COSTA, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Appellant-Defendant Kenneth Fairley appeals his jury conviction for theft of government property in violation of 18 U.S.C. § 641 (counts two and three) and conspiracy to commit theft of government property in violation of 18 U.S.C. § 371 (count one). Fairley argues that: (1) the indictment, jury instruction, and verdict form all misstated the elements of § 641; (2) the district court erroneously admitted recorded conversations as non-hearsay statements of a coconspirator; and (3) the district court improperly calculated Fairley's loss amount and imposed an inapplicable sentencing enhancement. Because errors in the indictment, jury instruction, and verdict form directly undermined Fairley's defense, we VACATE Fairley's conviction under counts two and three.

No. 17-60001

We AFFIRM Fairley's conviction under count one, and the district court's evidentiary and sentencing rulings. We REMAND to the district court to determine whether Fairley's sentence should change in light of the vacated convictions.[1]

## I.

After a six-day trial, a jury found Kenneth Fairley guilty of two counts of theft of government funds and one count of conspiracy to commit theft of government funds. The charges arose from a conspiracy between Fairley and another man, Arthur Fletcher, to submit inflated construction bills to a United States government-backed affordable housing program. Fairley was sentenced to 36 months imprisonment, concurrent as to all three counts.[2]

i.    *The HUD Grant*

The United States Department of Housing and Urban Development (HUD) operates the HOME investment program, which aims to increase availability of affordable housing. Through the HOME program, HUD partners with "participating jurisdictions," which in turn certify nonprofit Community Housing Development Organizations (CHDOs). Certified CHDOs are eligible to receive HUD grants for construction and renovation of affordable housing units.

Fairley served as executive director of Pinebelt Community Services, Inc., a nonprofit organization. In March 2010, the city of Hattiesburg, Mississippi, a HUD participating jurisdiction, designated Pinebelt as an approved CHDO. In August 2010, Hattiesburg and Pinebelt entered into a

---

[1]    *See United States v. McRae*, 795 F.3d 471, 483 (5th Cir. 2015) ("Our court's practice when one, but not all counts, within a multipart conviction has been vacated has generally been to remand to allow the district court to resentence in the first instance.").

[2]    Fairley was also sentenced to 36 months of supervised release and was assessed a fine of $30,000, restitution of $60,223.95 and a $300 special assessment.

contract under which Pinebelt agreed to develop three low-income housing units, and Hattiesburg agreed to reimburse Pinebelt with up to $100,000 of HOME program funds. The agreement also provided for Pinebelt to receive up to $18,637.60 in operating funds in addition to the HOME funds. The parties later amended the contract, and agreed that Pinebelt would instead renovate two single family homes: 202 South Street and 127 East 5th Street.

In July and August 2011, Pinebelt submitted two "request[s] for funds" to Hattiesburg totaling $98,000. The requests were signed by Fairley, and ostensibly sought reimbursement for "services rendered and allowable costs/expenditures" associated with rehabilitating the South Street and 5th Street homes. After receiving the requests, Hattiesburg paid Pinebelt $98,000.

ii.    *The Government's Case*

At trial the government presented evidence that Fairley conspired with his old friend Fletcher to defraud the government.[3] Fletcher owned Interurban Housing and Development LLC. To apply for and receive HOME funds from Hattiesburg, Pinebelt submitted documents suggesting that it had solicited bids for the contract, selected Interurban as a contractor after a competitive bidding process, and Interurban billed Pinebelt for $98,000 in construction costs at the two properties. According to the government, these documents were false, and Interurban did no work on the properties. Nonetheless, the government investigation showed that Pinebelt sent $72,000 to Interurban after receiving the $98,000 from the city.

An agent with the Office of the Inspector General testified that Fairley admitted to him that Interurban did no work on the South Street and 5th Street properties. The same agent testified that Fletcher admitted that

---

[3]    Fletcher was indicted with Fairley, but pled guilty to a related charge before trial. Fletcher did not testify at Fairley's trial.

No. 17-60001

Interurban did not work on the Pinebelt projects, but that Fletcher had allowed Fairley to use Interurban's name to qualify for HUD grants.

An IRS agent testified that a review of Pinebelt's finances showed that Pinebelt spent only approximately $38,000 renovating the two properties. The agent also documented several transfers, described as "seed money" necessary to secure the contract with Hattiesburg, from a charity controlled by Fletcher to Pinebelt.[4] The government presented evidence that the rehabilitation work on the properties was shoddy, and the properties did not pass inspection until years after Pinebelt was paid. Finally, the government played recorded phone calls between Fairley and Fletcher. In the calls, Fletcher attempted to collect money from Fairley, apparently provided to secure a second HUD contract with Hattiesburg.

 iii. *Fairley's Case*

In his defense, Fairley disputed the government's contention that Interurban did no work, and described the transfers from Fletcher's charity as loans and donations. Fairley also challenged the government's interpretation of HOME program regulations and the government's accounting. A HUD consultant called by Fairley testified that CHDOs may properly be reimbursed under HOME for operating expenses, including salaries. Fairley showed that, although HUD did investigate and suspend Pinebelt, the investigation found Pinebelt and Hattiesburg's documentation to be "satisfactory" and HUD eventually lifted Pinebelt's suspension.

Fairley also called an accountant and former IRS agent who testified that Pinebelt spent—including overhead costs—approximately $135,000 rehabilitating the South Street and 5th Street properties between August 2010

---

[4] Fletcher's charity raised money from third party donations. Fletcher profited from the scheme by shifting this money to his company, Interurban.

No. 17-60001

and August 2011. In addition, a construction contractor called by Fairley estimated that the value of Pinebelt's work on the two properties totaled approximately $149,000. Finally, Fairley elicited testimony that at least ten different contractors and between 15 and 20 volunteers worked on the two projects, and that Interurban had, in fact, worked on the projects.

iv. *The Verdict*

The jury found Fairley guilty on all three counts. The verdict form read as follows:

> 1. On Count 1 of the Indictment, conspiracy to commit theft in violation of 18 U.S.C. § 371, we, the jury, find the Defendant Kenneth E. Fairley, Sr.:
>
> _____ Guilty          _____ Not Guilty
>
> 2. On Count 2 of the Indictment, knowingly and willfully receiving, retaining, concealing, or converting any money, property, or thing of value belonging to the United States having an aggregate value of more than $1,000 in violation of 18 U.S.C. § 641, we, the jury, find the Defendant Kenneth E. Fairley, Sr.:
>
> _____ Guilty          _____ Not Guilty
>
> 3. On Count 3 of the Indictment, knowingly and willfully receiving, retaining, concealing, or converting any money, property, or thing of value belonging to the United States having an aggregate value of more than $1,000 in violation of 18 U.S.C. § 641, we, the jury, find the Defendant Kenneth E. Fairley, Sr.:
>
> _____ Guilty          _____ Not Guilty

The jury placed an "X" next to "Guilty" for all three counts. For counts two and three, the jury crossed out "retaining" and "concealing" on the verdict form, leaving only "receiving" and "converting" as the operative verbs. When

5

No. 17-60001

the verdict was read aloud by the district court's clerk, the clerk omitted the crossed out words.[5] Fairley did not object.

## II.

Count one of the indictment charged Fairley with conspiracy to commit theft of government property in violation of 18 U.S.C. § 371. Counts two and three charged Fairley with theft of government property in violation of 18 U.S.C. § 641. Fairley argues that the indictment, jury instruction, and verdict form all misstated the elements of § 641. Fairley asserts that: (1) the indictment was legally insufficient as to counts two and three, (2) the jury instructions permitted the jury to convict Fairley of a nonexistent offense under counts two and three, and (3) the errors in counts two and three invalidate his conspiracy conviction under count one. We begin by discussing the structure of § 641, and then evaluate Fairley's claims of error.

i.    *18 U.S.C. § 641*

Title 18, United States Code, Section 641 criminalizes two distinct acts. The first paragraph of § 641 makes it a crime to:

(1) "embezzle[], steal[], purloin[], or knowingly convert[] to [the defendant's] own use or the use of another";
(2) "a thing of value of the United States."

18 U.S.C. § 641. Under the second paragraph of § 641, it is a crime to:

(1) "receive[], conceal[], or retain[]";
(2) a thing of value of the United States;
(3) "with the intent to convert it to [the defendant's] use or gain";
(4) "knowing it to have been embezzled, stolen, purloined or converted."

---

[5]    The transcript for both counts reads: "On Count 2[/3] of the indictment, knowingly and willfully receiving or converting any money . . . ."

*Id.* In short, paragraph one covers stealing from the United States and paragraph two covers knowingly receiving stolen United States property. *See Milanovich v. United States*, 365 U.S. 551, 554 (1961) (discussing § 641 and distinguishing between "the provision of the statute which makes receiving an offense" and "the provision relating to robbery"); *United States v. Minchew*, 417 F.2d 218, 219 (5th Cir. 1969) (per curiam) ("The Court [in *Milanovich*] apparently concluded that Congress, by adding paragraph two to section 641 intended to reach a new group of wrongdoers, and not to multiply the offense of the thieves themselves.").

Even though § 641's two paragraphs target separate acts, *id.*,[6] the Fifth Circuit's pattern jury instruction for § 641 applies only to the first paragraph. Fifth Circuit Pattern Jury Instruction (Criminal Cases) § 2.27 (2015) ("Theft of Government Money or Property – 18 U.S.C. § 641 (First Paragraph)"). The Ninth Circuit's pattern instructions have separate entries, with different elements, for paragraphs one and two. *Compare* Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit § 8.39 (2010) ("Theft of Government Money or Property (18 U.S.C. § 641)") *with id.* § 8.40 ("Receiving Stolen Government Money or Property (18 U.S.C. § 641)").

Further, the verbs animating § 641's first two paragraphs are not fungible. The verbs in paragraph one—embezzle, steal, purloin, and convert—

---

[6]     *See also United States v. Zettl*, 889 F.2d 51, 53 (4th Cir. 1989) ("Section 641 prohibits two separate acts. The first is to embezzle, steal, or knowingly convert United States property and the second is to sell, convey, or dispose of United States property without authority."); *United States v. Belt*, 516 F.2d 873, 876 n.8 (8th Cir. 1975) ("In *Milanovich* the defendant had been charged with the distinct crimes of larceny under paragraph (1) of 18 U.S.C. [§] 641 and receiving stolen property under paragraph (2) of [§] 641 based on the same occurrence."); *United States v. Boyd*, 446 F.2d 1267, 1272 (5th Cir. 1971) (stating, on appeal of conviction under § 641, that a portion of the jury charge "was intended to inform the jury of the difference between larceny and the crime charged—reception, retention and concealment").

describe takings or possessions that are fraudulent or otherwise illegal. Paragraph two's verbs—receive, conceal, and retain—are broader, and cover innocent as well as illicit acts.

The government disagrees. It argues that § 641 is divided into separate paragraphs merely for historical reasons, and that this distinction has no bearing on this case. The government purports to cite authority in support, but its cases miss the mark. Some state generally that § 641 covers a broad range of conduct. *See Morissette v. United States*, 342 U.S. 246, 266 n.28, 271 (1952) (discussing § 641's broad reach and stating that there is "considerable overlapping *in the embezzlement, stealing, purloining and knowing conversion* grouped in this statute" (emphasis added)); *United States v. Dowl*, 619 F.3d 494, 501 (5th Cir. 2010) (per curiam) (noting § 641's "broad construction"). Others address even more tangential issues. *See United States v. Reagan*, 596 F.3d 251, 253 (5th Cir. 2010) ("[E]ach distinct taking of funds constitutes a separate violation under the statute."); *United States v. Bailey,* 734 F.2d 296, 304 (7th Cir. 1984) (describing § 641's "purpose" as "to provide a sanction for intentional conduct by which a person either misappropriates or obtains a wrongful advantage from government property"). And at least one undermines the government's position. *See United States v. Bauer*, 713 F.2d 71, 74 n.9 (4th Cir. 1983) ("[T]he Government may elect to charge, and obtain a conviction for, *either* theft or for receiving, concealing or retaining. That is to say that the crimes are not mutually exclusive.").

In short, nothing cited by the government causes us to doubt what is clear from both the statutory text and prior cases: section 641's first two paragraphs describe two distinct criminal acts, with distinct elements. Fairley's indictment, jury instructions, and verdict form all, in different ways, combined the first and second paragraphs of § 641 into a single purported

offense. This erroneous cross-incorporation, and its effect on Fairley's conviction, is discussed below.

ii.   *The Indictment*

Fairley challenges counts two and three of the indictment as insufficient.[7] These counts charge that Fairley "did knowingly and willfully retain, conceal, and convert to his own use or the use of another money of the United States in an amount greater than $1,000.00." In doing so, the indictment borrows the verbs "retain" and "conceal" from paragraph two of § 641. But the indictment omits paragraph two's remaining elements; it does not charge that Fairley acted: (1) "with the intent to convert" the United States' money to "his own use or gain"; or (2) "knowing [the money] to have been embezzled, stolen, purloined, or converted." 18 U.S.C. § 641. Fairley argues that by combining verbs from § 641's theft prong and receiving prong, the indictment charged him with a non-existent "hybrid offense" that does not encompass all elements of either criminal act.

Fairley concedes that he did not object to his indictment below, and we therefore review the indictment's sufficiency for plain error. *United States v. McGilberry*, 480 F.3d 326, 328-29 (5th Cir. 2007). "This standard requires a showing that there was (1) error, (2) that is plain, and (3) that affects substantial rights." *Id.* (internal quotations omitted). Even when these prongs are met, "[t]his court retains discretion to correct reversible plain error and will do so 'only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Dominguez-Alvarado*, 695

---

[7]    Although Fairley argues that jury instruction errors as to counts two and three undermine his conviction under count one, he expressly disclaimed any argument that count one, as charged in the indictment, was independently insufficient.

No. 17-60001

F.3d 324, 328 (5th Cir. 2012) (quoting *Puckett v. United States,* 556 U.S. 129, 135 (2009)).

"'[T]he validity of an indictment is governed by practical, not technical considerations,' and '[t]he basic purpose behind an indictment is to inform a defendant of the charge against him[.]'" *United States v. Cooper*, 714 F.3d 873, 877 (5th Cir. 2013) (second alteration in original) (quoting *United States v. Ramos*, 537 F.3d 439, 459 (5th Cir. 2008) and *United States v. Hoover*, 467 F.3d 496, 499 (5th Cir. 2006)). "An indictment is legally sufficient if (1) 'each count contains the essential elements of the offense charged,' (2) 'the elements are described with particularity,' and (3) 'the charge is specific enough to protect the defendant against a subsequent prosecution for the same offense.'" *Id.* (quoting *United States v. Threadgill*, 172 F.3d 357, 366 (5th Cir. 1999)). Fairley's argument goes to the first of these three requirements.[8]

The Fifth Circuit's pattern jury instruction for paragraph one of § 641 lists three elements:

> *First*: That the money [property] [thing of value] described in the indictment belonged to the United States government and had a value in excess of $1,000 at the time alleged;
> *Second*: That the defendant embezzled [stole] [knowingly converted] such money [property] [thing of value] to the defendant's own use [to the use of another]; and
> *Third*: That the defendant did so knowing the money [property] [thing of value] was not his and with intent to deprive the owner of the use [benefit] of the money [property] [thing of value].

Fifth Circuit Pattern Jury Instruction (Criminal Cases) § 2.27 (2015) (brackets in original); *see also United States v. Pruett*, 681 F.3d 232, 247 (5th Cir. 2012) (per curiam) (approving instruction). Omitting the words "retain"

---

8    Any potential duplicity challenge is forfeited by Fairley's failure to object before the district court. *See United States v. Stanford*, 805 F.3d 557, 567 (5th Cir. 2015).

and "conceal" from counts two and three of the indictment shows that the remaining language largely tracks the first and second pattern elements: the indictment describes "money of the United States in an amount greater than $1,000.00" (first element), and charges that Fairley "did knowingly and willfully . . . convert [it] to his own use or the use of another . . ." (second element).[9]

Fairley cites nothing suggesting that inserting additional words to describe a defendant's conduct may invalidate an otherwise competent indictment. *See United States v. Valencia*, 600 F.3d 389, 432 (5th Cir. 2010) (per curiam) ("We treat the allegation of additional facts beyond those which comprise the elements of the crime as 'mere surplusage.'" (quoting *United States v. Robinson*, 974 F.2d 575, 578 (5th Cir. 1992))). The indictment charges that Fairley "retain[ed], conceal[ed], *and* convert[ed]" government funds (emphasis added). Fairley did not object to his indictment, did not ask for a clarification, and does not argue that the superfluous verbs prejudiced his defense. Rather, at least according to Fairley, "the Government pursued a theory of 'theft of Government property' at trial, as opposed to the knowing

---

[9] Fairley has forfeited any argument concerning the government's wholesale omission of the third element, which covers knowledge and intent. If he had raised the argument, we would likely reject it. In *United States v. Lester*, we upheld an indictment charging conversion of postal funds that "traced the exact language of the statute" but did not include "a formal, express allegation of criminal intent." 541 F.2d 499, 501 (5th Cir. 1976). We reasoned that "[t]he term convert implies, by its very legal nature, some kind of willful purpose and wrongful intent in the taking of property that does not belong to the converter." *Id.* at 501-02. Accordingly, the indictment "was sufficient to apprise the defendant of the charges against her and it was sufficient to imply an allegation of wrongful intent." *Id.*; *see also United States v. Rainey*, 757 F.3d 234, 248 (5th Cir. 2014) (vacating dismissal of indictment where the allegations did "not exactly recite that Rainey knew a congressional investigation was pending, but the indictment as a whole fairly import[ed] the element." (alterations and quotation marks omitted)); *United States v. Henry*, 288 F.3d 657, 662 (5th Cir. 2002) ("While it is true that the allegations may not necessarily encompass a finding of knowledge, we have determined that a knowledge requirement may be inferred.").

receipt of stolen property[.]" There is no indication Fairley expected anything else.

This court has often noted that the "minimal constitutional standards" that an indictment must meet "do 'not compel a ritual of words.'" *Ramos*, 537 F.3d at 459 (quoting *United States v. Crow*, 164 F.3d 229, 235 (5th Cir. 1999)). Accordingly, "[a]n indictment need not precisely track statutory language." *Id.* (rejecting challenge to indictment charging that defendant "discharged" a firearm when statute prohibited "use" of a firearm); *Hoover*, 467 F.3d at 500 (rejecting defendant's "overly technical" argument "that the indictment failed to allege a false statement because 'complained' and 'told' are not synonymous terms"). Including two words from another offense—verbs that properly describe Fairley's alleged conduct, even if not an element of his offense—is not plain error.

### iii.   *Jury Instructions*

Fairley argues that, by conflating elements of § 641's theft and receiving prongs, the jury instruction and verdict form incorrectly stated the law. A jury instruction must: (1) correctly state the law, (2) clearly instruct the jurors, and (3) be factually supportable. *United States v. Phea*, 755 F.3d 255, 266 (5th Cir. 2014). "[S]pecific jury instructions are to be judged not in isolation, 'but must be considered in the context of the instructions as a whole and the trial record.'" *Id.* (quoting *United States v. Simkanin*, 420 F.3d 397, 406 (5th Cir. 2005)). Verdict forms are considered part of the jury instruction, and we evaluate the combined effect on the jury. *See Jones v. United States*, 527 U.S. 373, 393 (1999) ("[A]lthough the verdict forms standing alone could have [confused the jury], any confusion created by the verdict forms was clarified when considered in light of the entire jury instruction." (quoting *United States v. Jones*, 132 F.3d 232, 245 (5th Cir. 1998))); *see also United States v. Cardinas Garcia*, 596 F.3d

No. 17-60001

788, 799 (10th Cir. 2010) ("When reviewing a jury verdict form, we must determine whether it, along with the instructions read to the jury, as a whole adequately stated the applicable law.").

Fairley did not object below, and we therefore review the instruction for plain error.[10] Jury instruction error "does not amount to plain error unless it could have meant the difference between acquittal and conviction." *United States v. McClatchy*, 249 F.3d 348, 357 (5th Cir. 2001) (quotation marks omitted); *see also Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) ("It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court."). Still, "[w]hen a jury instruction omits or significantly misstates an essential element of an offense, the error may be severe enough to meet the plain-error standard." *United States v. Brown*, 553 F.3d 768, 785 (5th Cir. 2008) (quoting *United States v. Stone*, 960 F.2d 426, 434 (5th Cir. 1992)).

The district court instructed the jury regarding count two as follows:

Count 2 of the indictment accuses defendant Kenneth E. Fairley, Sr. of violating Title 18 of the United States Code, Section 641, which makes it illegal to knowingly and willfully *receive, retain, conceal or convert* any money, property or thing of value belonging to the United States having an aggregate value of more than $1,000.

---

[10]    Fairley contends that he is spared plain error review because the district court rejected proposed alternative instructions. The record does not reflect this. More importantly, even if Fairley did propose other language, "[a] party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection . . . . Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)." Fed. R. Crim. P. 30(d). At oral argument, Fairley's attorney suggested that trial counsel not only proposed alternative language, but also specifically objected to the § 641 "state of mind" instruction at the charge conference. As simultaneously acknowledged at oral argument, this assertion is not reflected in the record before us. It also contradicts Fairley's brief, which states "the defense did not object at trial either to the instructions or to the language of the verdict form[.]"

13

No. 17-60001

> For you to find the defendant Kenneth Fairley guilty of this crime, you must be convinced that the government has proven each of the following beyond a reasonable doubt:
>
> - First, that the money described in Count 2 of the indictment belonged to the United States and had a value in excess of $1,000 at the time alleged;
> - [S]econd, that the defendant, Fairley, knowingly and willfully *converted, received, retained, concealed or converted* such money; and,
> - [T]hird, that defendant Fairley did so *with intent to convert* said money to his use or the use of another (emphasis and bullets added).[11]

The court's charge for count three did not materially differ. These instructions departed from the pattern language we have previously adopted for § 641's "theft" paragraph in two ways. First, the district court's instructions replaced some pattern verbs in the second element—embezzle, steal, and knowingly convert—with verbs drawn from § 641's "receiving" paragraph—receive, retain, and conceal.[12] Second, the district court's instructions replaced the third element, which covers knowledge and intent, with a requirement that

---

[11]    The court later corrected its repetition of "converted."

[12]    The district court made very clear that the jury did not need to find that Fairley did all of these four acts, and could convict on a unanimous finding that Fairley did any one of them:

> The government does not have to prove all of these for you to return a guilty verdict on these charges. Proof beyond a reasonable doubt on one is enough. But in order to return a ver -- a guilty verdict, all of you must agree on the same one that has been proven. All of you must agree that the government proved beyond a reasonable doubt that the defendant knowingly and willfully received money, property or thing of value belonging to the United States, or all of you must agree that the government proved beyond a reasonable doubt that the defendant knowingly and willfully concealed money, property or thing of value belonging to the United States, or all of you must agree that the government proved beyond a reasonable doubt that the defendant knowingly and willfully retained money, property or thing of value belonging to the United States, or all of you must agree that the government proved beyond a reasonable doubt that the defendant knowingly and willfully converted money, property or thing of value belonging to the United States.

Fairley acted with "intent to convert," apparently also drawn from § 641's "receiving" paragraph.

In mixing the elements of "stealing" and "receiving," the district court failed to adequately charge as to either. The instructions as given permitted the jury to convict upon finding that Fairley: (1) knowingly and willfully *received* United States money, (2) with intent to convert it to his use. The first, "theft" paragraph of § 641 prohibits converting United States money, but says nothing about receiving with intent to convert. And the second, "receiving" paragraph prohibits receiving with intent to convert, but only when the defendant acts "knowing [the money] to have been embezzled, stolen, purloined, or converted." 18 U.S.C. § 641; *Schaffer v. United States*, 221 F.2d 17, 23 (5th Cir. 1955) ("To be guilty of [receiving, concealing, or retaining United States property under § 641], a defendant must himself have known that the property had been stolen.").

The verdict form repeated the error. It states:

> On Count 2[/3] of the Indictment, *knowingly and willfully receiving, retaining, concealing, or converting* any money, property, or thing of value belonging to the United States having an aggregate value of more than $1,000 in violation of 18 U.S.C. § 641, we, the jury, find the Defendant Kenneth E. Fairley, Sr.:
>
> _____ Guilty          _____ Not Guilty

(emphasis added).

Like the jury charge, the verdict form used verbs from § 641's receiving paragraph, but omitted the requirement that the defendant knew the money had been embezzled, stolen, purloined, or converted. But unlike the jury instruction, the verdict form made no mention of an intent to convert.

The district court's erroneous jury instruction was plain error. The failure to require proof of each element of conviction affected Fairley's substantial rights. *See United States v. Gaudin*, 515 U.S. 506, 511 (1995) ("The

15

Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged."); *see also United States v. Savoires*, 430 F.3d 376, 380 (6th Cir. 2005) (mixing elements of 18 U.S.C. § 924 in jury instructions and indictment was plain error); *United States v. Wilkins*, 253 F. App'x 538, 546-47 (6th Cir. 2007) (plain error where "the instructions mixed the elements of the use or carry [of a firearm under 18 U.S.C. § 924] offense with those of the possession offense"). True, the jury instructions permitted conviction only upon a finding that Fairley acted with "intent to convert [government money] to his use." And the resulting distinction—between knowingly converting money and receiving, retaining, or concealing money with intent to convert it—is slim. But Fairley built his defense in the space between receiving and converting.

Fairley did not dispute at trial that he received government funds. As his lawyer put it in closing: "Everybody agrees Pinebelt received the ninety-eight from the city. We agree on that. Got it in blue." Rather, Fairley argued that he properly spent HUD funds on renovating the two properties. He called several witnesses to support his theory that Pinebelt spent more money renovating the two properties than it received from the government. Fairley also disputed the government's interpretation of what expenses were properly reimbursable under the HOME Program. In short, Fairley sought to show that the government got the benefit it sought in exchange for its $98,000. Permitting the jury to convict on mere receipt with intent to convert therefore directly undermined Fairley's defense theory.[13]

---

[13] This discussion compares the jury's actual instruction to a proper instruction for conversion under paragraph one of § 641. The government has never argued that the instructions were proper under a paragraph two receiving theory, which, as noted, requires that the defendant acted "knowing [the government property] to have been embezzled, stolen, purloined or converted[.]" § 641.

No. 17-60001

Further, the effect of the jury instructions was compounded by errors in the verdict form and indictment. When it began deliberating, the jury had been provided three different recitations of the elements necessary to convict under § 641—instruction, verdict form, and indictment. Each of these differed from the others, and none correctly stated § 641's elements. All included verbs from the receiving prong, but none included the requirement that the defendant act knowing the property in question has been embezzled, stolen, purloined, or converted. Only one of the three included the element of acting with intent to convert the property.

The impact of these errors was also amplified by the government's argument to the jury. *See United States v. Chagra*, 807 F.2d 398, 402 (5th Cir. 1986) ("We review claimed deficiencies in a jury charge by looking to the entire charge as well as the arguments made to the jury."). The government brought and tried this case under the mistaken belief that receiving, retaining, and concealing government property is prohibited by § 641 even absent knowledge that the property was embezzled, stolen, purloined, or converted.[14] In closing argument, it differentiated between "theft of government money" as charged in count one, and the "receiv[ing], retain[ing], conceal[ing], or convert[ing]" offenses charged in counts two and three.

The government argues that these errors were cured by the jury's uninvited modification of the jury form. As noted, the jury crossed out "retaining" and "concealing" on the verdict form, leaving only "receiving" and

---

[14]    In its brief before this court, the government confirms its belief that counts two and three do not merely charge Fairley with theft of government money under § 641's first paragraph. The government asserts that "[t]he [Fifth Circuit] pattern instruction for § 641 addresses only the first paragraph of the statute and *thus only a modified version would apply to the charges in this case*" (emphasis added). At oral argument, the government appeared to still be unsure what crime Fairley was actually convicted of. When pressed, the government's attorney said: "I think that the best reading of the result is that [Fairley] was guilty of conversion."

"converting" as the operative verbs in counts two and three. According to the government, by crossing out "retaining" and "concealing," the jury indicated that they had unanimously found that Fairley both "received" and "converted" government money. This, to the government, cures any issue with the indictment or instructions, because knowing conversion is prohibited by paragraph one of § 641 and the term appears in the indictment, instruction, and verdict form.

The unprompted and unexplained verdict form modifications do not dissuade us in our discretion from finding plain error here. "Federal courts have long held that additional jury notations that are not directly responsive to the jury charge and verdict form are surplusage, and are to be ignored." *Great Pines Water Co. v. Liqui-Box Corp.*, 203 F.3d 920, 924 (5th Cir. 2000); *see also United States v. Ailsworth,* 138 F.3d 843, 846 (10th Cir. 1998) ("Generally, unnecessary or irrelevant statements in a verdict form may be disregarded as surplusage."). Applying this rule is particularly appropriate where, as here, no inquiry was made by the district court concerning how or why the verdict form was modified. Although the verdict was read aloud by the district court's clerk without the crossed out words, and the district court generally polled the jury, the court did not ask who crossed out the form or how the decision to do so was made.[15]

The government's argument that the cross-outs were, in fact, responsive to the jury charge is belied by the transcript. As noted, the district court

---

[15]    We also observe that the government's interpretation of the notes is not the only plausible one. For instance, maybe the jury found that "retaining" and "concealing" were not supported by the evidence, crossed them out, unanimously found that one of the remaining verbs was present, realized they had a conviction, and concluded deliberations without ever considering the final verb. Or maybe the foreperson made the alteration on his or her own. Or maybe the jury did exactly what the government assumes. On this record, we simply cannot know.

18

No. 17-60001

explained at length that the jury did not need to find that Fairley received, retained, concealed, *and* converted; they could convict on a unanimous finding that Fairley did any one of the four acts. The trial judge never told the jury to indicate *which* of the four acts supported its verdict or to cross out verbs they did not find unanimously. Accordingly, affirming Fairley's conviction based on anything beyond the "X" next to "guilty" would give effect to "additional jury notations that are not directly responsive to the jury charge and verdict form." *Great Pines Water Co.*, 203 F.3d at 924.

In short, the elements of § 641 were confused by the government's argument, the indictment, the jury instructions, and the verdict form. The combined error directly undermined Fairley's defense theory and permitted the jury to convict for a non-offense. This error seriously affected the fairness and integrity of Fairley's trial, and could have meant the difference between conviction and acquittal. We therefore vacate Fairley's conviction under counts two and three.[16]

  iv. *Count One*

Fairley was also convicted of count one, which charged that Fairley conspired to commit theft of government money in violation of § 641. Fairley argues that his conviction on this count must be vacated as well. Fairley points to no actual error in how count one was presented in the indictment, jury instructions, verdict form, or government's argument. Nor could he: all were true to § 641's theft prong. Rather, Fairley argues that because count one

---

[16] Fairley also argues that the jury instruction impermissibly enlarged the indictment by including "receiving" as one of Fairley's criminal acts. Constructive amendment, however, "occurs if the jury is permitted to convict on 'an alternative basis *permitted by the statute* but not charged in the indictment.'" *United States v. Daniels,* 252 F.3d 411, 414 (5th Cir. 2001) (emphasis added) (quoting *United States v. Robles-Vertiz*, 155 F.3d 725, 728 (5th Cir. 1998)). Because we find that the jury instructions misstated the law, any constructive amendment is beside the point.

19

rested on the same substantive offense as counts two and three, misstatements of the elements supporting count two and three necessitate vacating count one.[17] We hold that count one was distinct from the substantive counts and the errors regarding counts two and three therefore do not extend to cause plain error in Fairley's conspiracy conviction.

The district court instructed the jury that the first element of count one was "that the defendant and at least one other person made an agreement to commit the crime of *theft* of government money, *as charged in the indictment*" (emphasis added). The verdict form also described the offense as "theft" and referenced the indictment. Count one of the indictment charged that Fairley and Fletcher conspired to:

> defraud the United States or commit offenses against the United States as follows:
>
> *Embezzle, steal, purloin, or knowingly convert* to their use or the use of another any record, voucher, money, or thing of value of the United States or an agency thereof, in violation of Section 641, Title 18, United States Code (emphasis added).

Finally, as noted, the government's closing argument distinguished between "theft of government money" as charged in count one, and the "receiv[ing], retain[ing], conceal[ing], or convert[ing]" offenses charged in counts two and three. These repeated instructions made clear to the jury that count one—

---

[17]     Notably, Fairley's opening brief devotes only a single sentence—with no supporting authority—to arguing that errors in counts two and three invalidated count one. Fairley does expand this argument in his reply brief, but still fails to cite authority. In our independent analysis, we note that our court reversed a conspiracy conviction based on an erroneous instruction in a separate but related substantive count. *See United States v. Smithers*, 27 F.3d 142, 146 (5th Cir. 1994) (flawed jury instruction as to substantive offense "also undermine[d]" related conspiracy charge). But Fairley may well not have cited *Smithers* perceiving that it is inapposite because (1) Smithers preserved the error, and (2) there is no indication that Smithers' conspiracy count was in any way distinct from the flawed substantive count. *Id.* at 144 n.4, 145-47.

unlike counts two and three—charged Fairley with conspiring to *steal*, rather than merely *receive*, government money.

Further, count one does not encompass the retention, concealment, and conversion of government money charged in counts two and three. Although count one describes the conduct that led to receiving the HUD grants underlying counts two and three, actual receipt of those funds is not listed as an overt act committed in furtherance of the conspiracy. The list of overt acts includes the "seed money" transfers from Fletcher to Fairley, Fairley's submission of an engagement letter, and the later requests for funds. But it omits actual receipt.

Given this separation, and the high threshold of plain error review, Fairley's conviction on count one stands.

III.

At trial, the government prominently featured tape recorded conversations between Fairley and Arthur Fletcher. The district court admitted Fletcher's portion as non-hearsay statements by a coconspirator. Fairley's objection was overruled, and he now appeals.

A statement is not hearsay if "[t]he statement is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To introduce a statement under this rule, the proponent must show by a preponderance of the evidence: "(1) the existence of the conspiracy; (2) the statement was made by a co-conspirator of the party; (3) the statement was made during the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." *United States v. Hall*, 500 F.3d 439, 443 (5th Cir. 2007). The content of the challenged statement itself must be considered, but the proponent cannot establish admissibility based on the statement alone. *United*

*States v. Nelson*, 732 F.3d 504, 516 (5th Cir. 2013). "There must be 'independent evidence' establishing the conspiracy." *Id.* (quoting *United States v. El-Mezain*, 664 F.3d 467, 502 (5th Cir. 2011)).

Fairley argues that the government failed to establish that the statement was made during the course of the conspiracy or in furtherance of it. According to Fairley, the recorded statements were made in December 2012 and the conspiracy between Fairley and Fletcher ended in July 2011.  Fairley further argues that because the conversations chiefly concern Fletcher's attempt to recover money from Fairley, the two men were acting as adversaries and could not have been speaking in furtherance of a joint conspiracy. We review the district court's ruling for abuse of discretion. *United States v. Robinson*, 367 F.3d 278, 291 (5th Cir. 2004).

Fairley's argument misunderstands the nature of the coconspirator exception. Fairley focuses on the overt acts charged in the indictment as part of the conspiracy, which run only until August 2011. But "the evidentiary rule of conspiracy is founded on concepts of agency law" and therefore "differs from conspiracy as a crime." *El-Mezain*, 664 F.3d at 503 (quoting *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983)). Accordingly, "a conspiracy [for the purpose of hearsay exclusion] may be shown 'merely by engaging in a joint plan[ ] . . . that was non-criminal in nature.'" *Nelson*, 732 F.3d at 516 (second alteration and omission in the original) (quoting *El-Mezain*, 664 F.3d at 502). At trial, Fairley did not dispute that he worked with Fletcher to secure HUD grants. The government introduced considerable evidence to support a finding that Fairley and Fletcher were engaged in a joint venture, including signed documents and a separate recorded conversation between Fletcher and a City of Hattiesburg employee.[18]

---

[18]     Fairley did not object to admission of this recording.

No. 17-60001

Fairley and Fletcher's recorded conversations themselves confirm the continuing nature of the venture. Although contentious, the gist is Fletcher trying to collect money that he advanced to Fairley in the expectation he would be reimbursed with HUD funds. This underscores rather than negates the ongoing nature of the venture: the two men had not yet concluded their joint venture.

Furthermore, during the calls, Fairley repeatedly references plans to continue working together in the future. He says:

- "I know that these three, that the four of us collectively [Fairley, Fletcher, Pinebelt, and another person], *gonna find a way to complete the Fifth Street project and will find a way to complete the Sixth Street projects,* such that the city and [HUD] will be happy with the process and happy with the money spent and the, and the turn out of the project, and release the money."
- "[T]his has always been a money making proposition even now, *in the future* between [Interurban] and Pinebelt."
- "[T]he *next time when we, when do this* . . . on the Sixth Street house, . . . we gonna have an understanding before we get started."
- "I'm gonna move forward Fletch. I have heard you loud and clear. And, uh, I'm movin' forward to *get this stuff completed so we can be on the same team.* Get the monies paid back, that's what I'm sayin' to you. To get the monies that's been *allocated to us* paid back."
- "I just wanna make sure that *as we do this thing now we goin' forward.* Now, I know there's no [HUD] representative in this, diggin' in . . ." (emphasis added).

These statements, combined with the government's ample evidence of the existence of a conspiracy between Fairley and Fletcher, show that the conspiracy remained in effect at the time the conversations were recorded.

Fairley's argument that the statements were not made in furtherance of the conspiracy also fails. We have repeatedly cautioned "that the 'in furtherance' requirement is not to be construed too strictly lest the purpose of the exception be defeated." *United States v. Cornett,* 195 F.3d 776, 782 (5th Cir.

23

1999). Furthermore, "statements [made] in order to encourage loyalty and obedience among the conspirators [is] a purpose clearly in furtherance of the conspiracy." *United States v. Flores*, 63 F.3d 1342, 1377 (5th Cir. 1995). Fletcher's attempt to enforce his understanding of his bargain with Fairley is therefore a furtherance. *See United States v. Graham*, 711 F.3d 445, 454-55 (4th Cir. 2013) (discussions concerning attempt to collect a drug debt were made in furtherance of conspiracy).

Accordingly, we hold that the district court did not abuse its discretion by admitting the challenged recordings.

IV.

Finally, Fairley contests two sentencing factors applied by the district court. First, Fairley asserts that the court improperly calculated Fairley's loss amount. Second, Fairley maintains that the district court erred by enhancing his sentence for abuse of a position of trust. Neither argument is persuasive.

i.    *Loss Amount*

The district court's loss-amount calculation is a factual finding reviewed for clear error. *United States v. Hebron*, 684 F.3d 554, 560 (5th Cir. 2012). But the court's *method* of calculating those losses is an application of the guidelines subject to de novo review. *Id.* The district court sentenced Fairley based on intended loss, which exceeded HUD's actual loss. *See id.* ("The applicable loss is generally the greater of actual loss—which includes only reasonably foreseeable harm resulting from the fraud—and intended loss—which includes the harm intended to result from the offense."). "[T]he guidelines emphasize the deference that must be shown to the sentencing judge, who is in a unique position to assess the applicable loss, so this court need only determine whether the district court made 'a reasonable estimate of the loss.'" *Id.* (quoting

No. 17-60001

U.S.S.G. § 2B1.1 cmt. 3(C)); *see also United States v. Izydore*, 167 F.3d 213, 222 (5th Cir. 1999) ("[T]he amount of loss need not be determined with precision.").

The court calculated Fairley's intended loss amount by combining: (1) its determination of the actual loss associated with the contract for the South Street and 5th Street properties, and (2) its estimate of the intended loss on a second HUD home renovation contract signed by Pinebelt in October 2011, but later voided by HUD. Specifically, as to the completed August 2010 contract, the court subtracted $37,776.05 in legitimate labor and materials expenses from the total $98,000 received pursuant to the HUD grant and arrived at a loss of $60,223.95. For the uncompleted October 2011 contract, the court reduced the total value of that contract, $118,637.60, by 38.5%—consistent with the proportion of grants received for legitimate expenses in the first contract—for a loss of $72,962. In other words, the district court assumed for loss calculation purposes that, had the October 2011 contract not been rescinded, Fairley would have realized the same illicit gain as a percentage of the contract amount as he had under the August 2010 contract.[19]

Fairley contests both the district court's method and its actual loss calculation. Regarding the calculation, Fairley maintains that the court should have credited his evidence concerning additional expenditures on the South Street and Fifth Street properties. The court rejected Fairley's evidence, finding that it included overheard expenses that could not be reimbursed under the terms of the contract, as well as expenses for storm damage repair after the contract was completed. The court instead credited the testimony of an IRS agent, who calculated Pinebelt's total permissible costs under the contract as $37,776.05. The district court's choice to rely on the credible testimony of the

---

[19] $$\frac{\$60,223.95}{\$98,000} = \frac{\$72,962}{\$118,637.60} = 61.5\%$$

agent and other government witnesses, rather than Fairley's competing experts, was not clearly erroneous. *See United States v. Sotelo*, 97 F.3d 782, 799 (5th Cir. 1996) ("Credibility determinations in sentencing hearings 'are peculiarly within the province of the trier-of-fact.'" (quoting *United States v. Sarasti*, 869 F.2d 805, 807 (5th Cir. 1989))).

Fairley also argues that he should have received credit for the actual value of the South Street and 5th Street properties. But Pinebelt was paid pursuant to a grant program that took no interest in the properties to be renovated. Although a later agreement between the City of Hattiesburg and Pinebelt contemplated foreclosure, this agreement was signed several months after Pinebelt was paid. Fairley presented no evidence that the City ever foreclosed or took any ownership in the property, or that HUD, the victim, would be reimbursed even if the city had. Accordingly, the district court concluded that the value of the South Street and 5th Street properties was "irrelevant." This finding was not clearly erroneous.

As to the method of calculation, Fairley asserts that the district court impermissibly speculated when it increased Fairley's loss amount based on the uncompleted October 2011 contract. *See Nelson*, 732 F.3d at 520 ("[T]he calculation of intended loss cannot be 'purely speculative.'" (quoting *United States v. Roussel*, 705 F.3d 184, 201 (5th Cir. 2013))). But we have repeatedly affirmed similar estimates based on unconsummated crimes. For instance, in *United States v. John*, the defendant, a bank employee, provided customer account information to associates who used the information to make fraudulent charges. 597 F.3d 263, 279 (5th Cir. 2010). Although only four accounts were charged, resulting in a total actual loss of $78,750, evidence showed that John had printed and disseminated information for seventy-six accounts. *Id.* The district court calculated John's intended loss amount by

aggregating the credit limits of all seventy-six accounts, a sum of nearly $1.5 million. *Id.* at 278-79. We found no reversible error. *Id.* at 281; *see also United States v. Jones*, 533 F. App'x 448, 456-57 (5th Cir. 2013) (per curiam) (district court did not err in "extrapolating the $2,000 loss [the defendant] intended to inflict on the date of her arrest by an estimate of similar operations in which she was found to have engaged"). Here, there is no reason to believe that—after defrauding the government on one contract—Fairley and Fletcher intended to play it straight on the second contract. Sentencing Fairley based on a reasonable expected loss amount under the second HUD contract was far from speculation.

Because the district court's method for calculating loss is consistent with past approaches approved by this court, and its conclusion is not clearly erroneous, Fairley's argument on this point fails.

ii.    *Abuse of Position of Trust*

Fairley also disputes the district court's application of an enhancement for abuse of a position of trust pursuant to United States Sentencing Guidelines Manual § 3B1.3. Section 3B1.3 provides for a two point increase in the defendant's offense level "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense[.]" U.S.S.G. § 3B1.3. "This court applies a two-part test to determine whether there has been an abuse of trust: '(1) whether the defendant occupies a position of trust and (2) whether the defendant abused her position in a manner that significantly facilitated the commission or concealment of the offense.'" *United States v. Miller*, 607 F.3d 144, 148 (5th Cir. 2010) (quoting *United States v. Kay*, 513 F.3d 432, 459 (5th Cir. 2007)). Application of this enhancement is "a sophisticated factual determination" that we review for clear error. *Pruett*, 681 F.3d 232 at 248.

27

No. 17-60001

We have repeatedly upheld application of the enhancement for abuse of a position of trust in similar contexts.  For example, we have upheld its application to owners of licensed durable medical equipment (DME) provider companies that bill Medicaid and Medicare. The enhancement applies because Medicaid and Medicare "depend[] upon the honesty and forthrightness of the DME provider in its claim submissions[.]" *Miller*, 607 F.3d at 150. Owners of such companies occupy a position of trust because "the government entrust[s them] to provide good faith, accurate information in seeking reimbursement." *Id.*; *see also United States v. Nowlin*, 640 F. App'x 337, 349-50 (5th Cir. 2016) (per curiam) (district court did not err in applying § 3B1.3 to owner of DME company); *United States v. Usman*, 460 F. App'x 414, 418-19 (5th Cir. 2012) (per curiam) (district court did not err in applying § 3B1.3 to owner of private ambulance company).

Fairley served as executive director of Pinebelt, an approved Community Housing Development Organization under HUD's HOME Investment Partnerships Program. In this role, Fairley occupied a position of trust with respect to HUD that mirrors the role of a DME provider under Medicaid and Medicare. Testimony elicited at trial showed that HUD, through Hattiesburg, relied on Pinebelt's representations of its own expenses in seeking reimbursement.[20]  Further, Fairley's position as director of a CHDO facilitated the commission of the offense: only CHDO's are eligible to receive HOME funds. Accordingly, the district court's application of the abuse of a position of trust enhancement was not clear error.

---

[20]    One of Fairley's witnesses, a HUD consultant, agreed that HUD "assume[s]" that the money given to a CHDO "is going to be spent in a way that's consistent with the program[.]"

V.

For the forgoing reasons, we VACATE Fairley's conviction on counts two and three and REMAND to the district court for further proceedings consistent with this opinion. We AFFIRM Fairley's conviction on count one.

No. 17-60001

GREGG COSTA, Circuit Judge, dissenting in part:

When a defendant raises an issue for the first time on appeal, any mistake he shows can only be a basis for vacating the conviction if, among other things, the defendant can prove that the error affected his substantial rights. *United States v. Olano*, 507 U.S. 725, 734 (1993). This prejudice inquiry—like its counterpart of "harmless error" analysis that just has a different burden with the government having to prove that a preserved error did not impact the result—causes appellate judges to engage in inquiries they do not ordinarily undertake. For example, usually we are not supposed to "weigh the evidence." But we can, and often must, when deciding the prejudicial effect of a trial error. *See, e.g.*, *United States v. Davis*, 609 F.3d 663, 684 (5th Cir. 2010); *United States v. Rice*, 607 F.3d 133, 140 (5th Cir. 2010). Appellate courts also normally do not assess a witness's credibility, but, in a prejudice inquiry, we have to evaluate the force of impeachment evidence that was not available at trial. *Turner v. United States*, 137 S. Ct. 1885, 1894–95 (2017); *United States v. Bowie*, 198 F.3d 905, 910–11 (D.C. Cir. 1999) (contemplating how undisclosed evidence would have been used at trial to impeach a police officer). The length of time it took the jury to reach a verdict does not factor into a challenge to the sufficiency of the evidence, but appellate courts may consider it when evaluating whether an error had an effect on the verdict. *Rogers v. United States*, 422 U.S. 35, 40 (1975); *Marino v. Vasquez*, 812 F.2d 499, 506 (9th Cir. 1987) (citing cases). Why do many of the rules that typically govern appellate review go out the window when a court is engaging in a prejudice or harmlessness inquiry? Because the very nature of such an inquiry requires a reviewing court to do something at odds with its typical function: place itself in the jury box to speculate about how the jury reached its verdict.

No. 17-60001

If speculation about what the jury thought is allowed in a prejudice analysis, how can we ignore powerful evidence of what the jury actually thought?  The jury provided that with its cross-outs showing that it found Fairley guilty under the conversion theory for which the instruction was proper.  The only plausible meaning of the jury's crossing out "retaining" and "concealing" is as a response to the court's unanimity instruction:

> All of you must agree that the government proved beyond a reasonable doubt that the defendant knowingly and willfully received money, property or thing of value belonging to the United States, or all of you must agree that the government proved beyond a reasonable doubt that the defendant knowingly and willfully concealed money, property or thing of value belonging to the United States, or all of you must agree that the government proved beyond a reasonable doubt that the defendant knowingly and willfully retained money, property or thing of value belonging to the United States, *or all of you must agree that the government proved beyond a reasonable doubt that the defendant knowingly and willfully converted money, property or thing of value belonging to the United States.*

The district court thus read the verdict aloud as a finding of guilt only for the offenses that were not deleted: "knowingly receiving or converting any money." That verdict is the one to which the jury assented with a show of hands.[1]

But the majority opinion says we cannot consider the cross-outs in assessing the impact of the instruction error because "additional jury notations that are not directly responsive to the jury charge and verdict form are surplusage and are to be ignored."  Maj. Op. at 19.  Even accepting that principle as stated, it does not bar consideration of the cross-outs given the trial court's view that they were a response to the court's unanimity

---

[1] The majority opinion's attempt to come up with other possible reasons for the cross-outs is thus at odds with the district court's understanding.  Maj. Op. at 20 n.62.  But even if those theories are remote possibilities, they do not help Fairley because he bears the burden of demonstrating prejudice and certainly the most likely reason for the cross-outs is the unanimity requirement.

instruction. And any rule placing jury notations off limits is not as firm as the majority opinion suggests; courts typically frame it as a matter of discretion.[2] More fundamentally, the cited cases involve courts refusing to use sidenotes on the jury form to alter the official verdict. *Great Pines Water Co. v. Liqui-Box Corp.*, 203 F.3d 920, 924 (5th Cir. 2000); *see also United States v. Ailsworth*, 138 F.3d 843, 846 (10th Cir. 1998). So, for example, if a jury put $120,000 in the damages column of a civil verdict form, a side note showing the jury incorrectly added $80,000 and $50,000 would not override the official award it made. That rule makes sense for a number of reasons. But it is not implicated here because the government is not seeking to use the cross-outs to change the official "guilty" verdict the jury rendered. The question is whether the jury's clarifying action can be considered in deciding whether that guilty verdict should stand in light of an error in the charge that was not identified until this appeal. The majority opinion cites no case preventing us from considering clear indications from the jury in the context of a prejudice inquiry. In fact, one of the main rationales for excluding extraneous notes in the ordinary situation is that invoking them constitutes an "attempt to expose the jury's collective mental process to judicial scrutiny." *United States v. D'Angelo*, 598 F.2d 1002, 1003 (5th Cir. 1979). Yet that speculation about the "mental processes" of the jury is exactly what a prejudice inquiry requires.

---

[2] *See, e.g.*, *Statler v. United States*, 157 U.S. 277, 279 (1895) ("Surplusage in a verdict *may be* rejected, being harmless . . . ." (emphasis added)); *United States v. Ailsworth*, 138 F.3d 843, 846 (10th Cir. 1998) (holding that so long as notations do not cast doubt on the unqualified nature of a general verdict, "unnecessary or irrelevant statements in a verdict form *may be* disregarded as surplusage" (emphasis added)); *Slotkin v. Citizens Casualty Co. of New York*, 614 F.2d 301, 318 (2d. Cir. 1979) (holding that a jury's attempt through extraneous notations to allocate damages between defendants they have found jointly and severally liable was mere "surplusage which *may be* disregarded" (emphasis added)); *Prudential Ins. Co. of America v. Faulkner*, 68 F.2d 676, 681 (10th Cir. 1934) (stating that a court *may* disregard a jury's notations following an award of damages concerning how the award should be divided into installment payments).

In conducting the prejudice inquiry, I would thus consider the cross-outs which demonstrate that the jury found Fairley guilty under the permissible conversion theory.   Indeed, the jury's responsiveness to the unanimity instruction shows that it might have picked up on some of the errors in the instruction that went unnoticed by counsel and the court.  *Cf. Plough v. Baltimore & Ohio R. Co.*, 172 F.2d 396, 399 (2d. Cir. 1949) (L. Hand, C.J., dissenting) ("It is the office of special verdicts to avoid the effects of misdirections by the judge.  They are valuable –very valuable, I believe – just because when they are used, the charge need not be impeccable.").  I would not undo the jury's conscientious work that notifies us that it convicted on the permissible ground of conversion.

Even if we cannot consider the cross-outs, I still do not believe Fairley has met his plain-error burden of showing that the instruction error affected the verdict.  The fear is that the flawed instructions allowed the jury to convict only on a finding that Fairley received or retained money from the government with the intent to convert it, but that he never actually got around to converting it (because if he had actually converted the money, that would be a crime).  On the facts of this case, there is not much daylight between these two theories as the majority opinion acknowledges. Maj. Op. at 17.  Given that the jury had to find that Fairley intended to convert the public funds, when did he intend for that conversion to occur if not when the government sent him the money?  No theory of post-receipt theft was advanced at trial, which means that Fairley's intent to convert must have already manifested itself.   The thrust of Fairley's defense was that the money was used for a proper purpose of renovating the properties.  That would have defeated an "intent to convert" element just as much as it would have defeated an element of actual conversion.  If anything, Fairley's defense may have stood a better chance with the erroneous "intent to convert" language because he argued that the

33

disagreement with the government stemmed from different views about what expenses were reimbursable under the HOME program. If Fairley harbored a mistaken but honestly held view about those reimbursements, that could have defeated the intent requirement. So even without consideration of the cross-outs, Fairley has not met his burden of showing that the unpreserved error substantially affected his rights.

All this has said nothing about the final and more demanding condition that must be met before we can vacate a verdict for a reason not presented to the trial court: that the error seriously affected the "fairness, integrity, or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736. The same considerations that prevent Fairley from demonstrating prejudice also influence this assessment of whether the overlooked error resulted in an injustice. So should the fact that the cost of correction, in terms of the burden on the parties, jury, and trial court, is much greater when a verdict is vacated than when a sentence is. *Cf. United States v. Sabillon-Umana*, 772 F.3d 1328, 1334 (10th Cir. 2014) (Gorsuch, J.) (adopting a presumption that the fourth requirement of plain-error correction is satisfied in sentencing cases in part because the "cost of correction is so small" compared to vacating convictions). It was this concern with upsetting verdicts "for error not brought to the attention of the trial court" that gave rise to the stringent final requirement for plain-error correction in an era—quite different from ours—when sentencing appeals were virtually nonexistent. *United States v. Atkinson*, 297 U.S. 157, 159 (1936) (explaining that the principle against vacating verdicts because of errors not raised at trial "is founded upon considerations of fairness to the court and to the parties and of the public interest in bringing litigation to an end after fair opportunity has been afforded to present all issue of law and fact"); *see Olano*, 507 U.S. at 736 (recognizing that *Atkinson* set forth the

plain-error standard later codified in 1944 as Federal Rule of Criminal Procedure 52(b)).

I therefore would affirm the guilty verdicts on all three counts.